**SAN DIEGO GAS & ELECTRIC COMPANY, Plaintiff-counter-defendant-Appellant,**

v.

**CANADIAN HUNTER MARKETING LTD.; Noranda, Inc., and Related Counterclaims, Defendants-counter-claimants-Appellees.**

No. 96–56374.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1997.

Decided Dec. 31, 1997.

**1304**

James L. Hunt, McCutchen, Doyle, Brown & Enersen, San Francisco, California, for plaintiff-counter-defendant-appellant.

Charles Ferguson, LeBoeuf, Lamb, Leiby & Macrae, San Francisco, California, for defendants-counter-claimants-appellees.

Before: PREGERSON, D.W. NELSON and HAWKINS, Circuit Judges.

D.W. NELSON, Circuit Judge:

Plaintiff San Diego Gas and Electric Company ("San Diego Gas"), a California public utility, appeals the district court's grant of summary adjudication to defendants Canadian Hunter Marketing Ltd. ("Canadian Hunter") and Noranda, Inc., Canadian Hunter's parent company. The district court found that, under Section 12(1) of the Alberta Sale of Goods Act ("SGA"), R.S.A, Ch. S-2 (1980) (Can.), changes in California regulatory procedures had invalidated a contract between the parties for the sale of natural gas. San Diego Gas argues on appeal that summary judgment for Canadian Hunter was inappropriate both because genuine issues of material fact remain to be resolved and because the district court erred in its legal analysis of the substantive issues. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In the late 1970s, the Federal Energy Regulatory Commission began to deregulate the United States natural gas industry, permitting utility companies like San Diego Gas to look beyond their traditional sources of natural gas to alternative, more economical sources. At the same time, depressed natural gas prices in Canada encouraged Canadian suppliers to seek access to American markets, where they could obtain higher prices for their products. It was under these circumstances that San Diego Gas and Canadian Hunter negotiated an agreement by which Canadian Hunter could provide and San Diego Gas could purchase a guaranteed long-term supply of natural gas. On March 12, 1991, the parties executed a Natural Gas Purchase Agreement ("the Agreement"), which, the parties agreed, would be governed by the law of Alberta, Canada.

At the outset of contract negotiations, San Diego Gas made clear that it was willing to purchase gas from Canadian Hunter only if the gas could be obtained at prices competitive with those offered by San Diego Gas' traditional suppliers in the American Southwest. Accordingly, the parties negotiated a pricing arrangement under which the price of gas purchased from Canadian Hunter would be fixed at a level slightly lower than the weighted average cost of gas (WACOG) ob-

tained by San Diego Gas from its Southwestern suppliers. The Agreement also provided that Canadian Hunter would bear the additional costs of transporting the gas from Canada.

Under the regulatory scheme in effect when the Agreement was executed, San Diego Gas was entitled to recover from its ratepayers the costs that it had incurred in purchasing gas, provided that those costs were reasonable. The reasonableness of San Diego Gas' purchases was evaluated each year by the California Public Utilities Commission ("the Commission"). Fuel purchases deemed by the Commission to have been "imprudent" were "subject to disallowance," which meant that San Diego Gas could not pass on the cost of those purchases to ratepayers.

In order to account for the possibility that one or more of San Diego Gas' Southwest gas purchases might be disallowed by the Commission, San Diego Gas requested that Commission approval be incorporated into the pricing arrangement in its contract with Canadian Hunter. Accordingly, the Agreement was drafted to define the WACOG as follows:

> WACOG = the Monthly volume weighted average purchased cost of gas (in $U.S./MMBtu) *as approved by the [Commission], currently in the reasonableness phase of an Energy Cost Adjustment Clause proceeding, for firm, term, and spot gas acquired for [San Diego Gas'] account* (i) through purchases made under tariff from SoCal for delivery to [San Diego Gas'] System; (ii) at the interconnection of the El Paso system and the SoCal system; and (iii) at the interconnection of the Transwestern system and the SoCal system, both being near the California/Arizona border.

(emphasis added). Thus, expenditures disallowed by the Commission because they were unreasonably high would be excluded from the weighted average, bringing down the average and, under the formula, bringing down the price that San Diego Gas owed to Canadian Hunter. Ultimately, then, the price for gas purchased by San Diego Gas from Canadian Hunter was not finalized until the Commission had approved retrospectively the Southwest gas purchases comprising the WACOG.

At the time the Agreement was signed in 1991, the Commission reviewed the reasonableness of San Diego Gas' expenditures in an "Energy Cost Adjustment Clause" ("ECAC") proceeding. Under this procedure, San Diego Gas filed a report with the Commission each year describing the gas procurement expenses that it sought to pass on to ratepayers. San Diego Gas also submitted confidentially the data underlying its report, providing specific information about individual gas purchase transactions.

San Diego Gas' annual report and the underlying data were reviewed and audited by the Commission's Division of Ratepayer Advocates ("Advocates' Division"). The Advocates' Division "had the right to challenge the reasonableness or prudence of any or all of [San Diego Gas'] individual gas purchase transactions," and ultimately submitted a report to an administrative law judge recommending either allowance or disallowance of those transactions. The judge then issued a proposed decision, subject to adoption or modification by the Commission itself.

San Diego Gas and Canadian Hunter both acknowledge that, with one exception, the Advocates' Division consistently recommended that San Diego Gas' gas procurement expenses be deemed reasonable during the period from May 1988 through March 1991, when the Agreement was finalized. On one occasion in late 1990, however, the Advocates' Division advised the CPUC to disallow a specific gas contract into which San Diego Gas had entered, determining that San Diego Gas had paid an unreasonable price for a gas purchase from the Elk Hills Naval Petroleum Reserve. In response, San Diego Gas argued that the Commission, in prior decisions, had established the practice of assessing the reasonableness of its expenditures by examining "the construction of the gas *portfolio*," (emphasis added), not by reviewing each of the contracts in the portfolio. Accordingly, San Diego Gas maintained that no individual contract could be approved or disapproved in isolation.

Although the Commission ultimately decided not to disallow the Elk Hills purchase, it

explicitly disagreed with San Diego Gas' interpretation of its past decisions:

[T]he Commission may review individual contracts and is not limited only to reviewing aggregate supply portfolios. Individual contract review is necessary to establish the supply balance and cost considerations contained in the portfolio. The terms, including price, of each contract that combine to form the portfolio must be evaluated to establish the reasonableness of the core portfolio.

The Commission then proceeded to evaluate the reasonableness of the Elk Hills purchase, concluding that, while San Diego Gas may have paid more than comparable market prices for the gas it purchased from Elk Hills, other exigent circumstances made it reasonable for San Diego Gas to do so.

In October 1992, San Diego Gas submitted an application requesting that the Commission alter its reasonableness review procedures. Specifically, San Diego Gas sought to have its gas procurement expenses reviewed through a "Performance Based Ratemaking" (PBR) mechanism. The Commission approved San Diego Gas' application in June 1993, and San Diego Gas began operating under a PBR mechanism on August 1, 1993, three months before deliveries commenced under its Agreement with Canadian Hunter.

Under PBR, as under ECAC, the Advocates' Division reviews San Diego Gas' annual report and underlying data, comparing San Diego Gas' actual purchases to market-based purchase indices. The significant difference between the two procedures, as far as the current dispute is concerned, is that the PBR mechanism "eliminates reasonableness review of SDG & E's gas procurement costs," giving San Diego Gas the ability "to procure gas under any contract terms that its management deems appropriate" so long as the resulting total cost of gas compares favorably to the relevant benchmarks. The Commission made this change in order to enhance productive efficiency, noting that under the former system, regulators could "miss the success of an overall procurement strategy by focusing on particular contracts and a narrow timeframe."

This change in review procedures is at the center of this dispute on appeal. Pursuant to the Agreement, Canadian Hunter began delivering gas to San Diego Gas in November 1993. By that time, however, prices in the Canadian gas market had increased. Canadian Hunter, recognizing that it was selling gas to San Diego Gas at prices substantially below those available elsewhere, sought to avoid its contract with San Diego Gas. Because the Agreement's price terms remained favorable to San Diego Gas, however, San Diego Gas filed a complaint in December 1993 requesting that the Agreement be declared valid and enforceable. Canadian Hunter responded with a number of counterclaims, one of which was that the change from ECAC to PBR review had made it impossible to set the price for gas in the manner to which the parties had agreed, rendering the contract voidable under Section 12(1) of the Alberta SGA. After an initial round of litigation, the parties filed cross-motions for summary adjudication in December 1995.

The district court granted summary judgment in favor of Canadian Hunter. San Diego Gas timely appeals that decision, arguing that summary judgment for Canadian Hunter was inappropriate both because genuine issues of material fact remain to be resolved and because the district court erred in its legal analysis of the substantive issues.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* We must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996).

## ANALYSIS

I. *No material factual disputes preclude summary judgment.*

■ San Diego Gas contends that it was improper for the district court to resolve a

factual dispute regarding contract interpretation on a motion for summary judgment. At issue is the district court's interpretation of Paragraph 6.1 of the Agreement. Paragraph 6.1 makes clear that the WACOG is to be calculated based only on those costs that (1) are "approved by the CPUC" and (2) arise from Southwest gas transactions (a subset of San Diego Gas' transactions in any given year). Paragraph 6.1 fails, however, to clarify what constitutes approval by the Commission of gas costs. It does not, on its face, indicate whether the parties contemplated the Commission's approval of individual Southwest gas purchase transactions, as Canadian Hunter contends, or of an aggregate of those purchases over an extended period of time, as San Diego Gas argues.

The district court acknowledged this ambiguity in the Agreement's terms. Pursuant to Alberta law, *Hoefle v. Bongard & B Co.* [1945] 2 D.L.R. 609, 622–23, the court considered parol evidence in order to ascertain the parties' intent, examining the sworn testimony of two San Diego Gas executives. San Diego Gas argues that the court's consideration of extrinsic evidence of the parties' intent to resolve a contractual ambiguity was improper on a motion for summary judgment.

If we find a contract to be ambiguous, we "ordinarily" are hesitant to grant summary judgment "because differing views of the intent of parties will raise genuine issues of material fact." *Maffei v. Northern Ins. Co.*, 12 F.3d 892, 898 (9th Cir.1993). This circuit has not, however, adopted a rigid rule prohibiting reference to extrinsic evidence in resolving a contractual ambiguity on a summary judgment motion. *See, e.g., International Bhd. of Elec. Workers Local 47 v. Southern Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir.1989) (examining parol evidence on summary judgment motion in effort to reconcile conflicting contract provisions). Rather, "[c]onstruing all evidence in the light most favorable to, and making all reasonable inferences in favor of, the non-moving party," we have sought to determine whether the ambiguity could be resolved in a manner consistent with the non-moving party's claim. *Id.*

Only if the ambiguity could be so resolved would summary judgment be denied. *Id.*

Applying this standard, the district court did not err in determining that there was no material factual dispute as to the parties' intent regarding the Commission approval provision. In its decision, the court referred to a sworn declaration submitted by Joseph Vacarro, a San Diego Gas executive who helped to negotiate the Agreement. In his declaration, Vacarro explained that San Diego Gas had requested the inclusion of the Commission approval language as a "safety mechanism" so that, "[i]n the event that the [Commission] disallowed *any* of [San Diego Gas'] Southwest gas costs, and so in effect reduced the WACOG, that reduction could be reflected in the Agreement price." (emphasis added). Another San Diego Gas executive submitted similar testimony to the Canadian National Export Board.

Based on this evidence, the court concluded that the parties intended for the Commission approval provision to compensate San Diego Gas in the event that the Commission disapproved any of the specific transactions that formed the basis for the WACOG. The court found that none of the evidence submitted by San Diego Gas contradicted this central point and, further, that the Commission approval provision "*could only have meaning if the Commission was required or willing to examine and approve or disapprove any particular purchase price for gas.*" (emphasis added).

We affirm the district court's finding. The Agreement provides that only Commission-approved gas purchases from the Southwest be used to compute the Agreement WACOG and, ultimately, the contract price. Put another way, any gas purchases from the Southwest that are *disapproved* are *excluded* from the Agreement WACOG. It consequently is difficult to understand how this provision could operate—or, indeed, could make any sense at all—unless the Commission had the ability to disapprove individual gas purchase transactions. In any given year, San Diego Gas purchases gas from a number of sources outside of the Southwest; the Agreement WACOG, however, is based only on Southwest gas purchases. If the

Commission disapproved San Diego Gas' annual expenditures in the aggregate, it would be impossible to discern whether the Commission had disapproved the specific Southwest purchases on which the Agreement WACOG is based. Without that information, the parties could not make the appropriate adjustment to the Agreement price. It therefore defies common sense to resolve the ambiguity in Paragraph 6.1 in the manner that San Diego Gas proposes.

The evidence cited by San Diego Gas to establish a dispute regarding the parties' intent is inapposite. First, San Diego Gas points to evidence indicating that both parties were aware that the Commission approval mechanism might change while the Agreement was in effect and argues, based on that evidence, that the Agreement cannot be read to require approval of individual transactions. Were Canadian Hunter arguing that *any* change in Commission's review procedures would invalidate the pricing arrangement, San Diego Gas' evidence might be relevant. That the parties anticipated *some* change in the Commission's procedures does not, however, alter the fact that the Commission approval clause only makes sense if the Commission had the power to disapprove individual purchases.

■ Second, San Diego Gas refers to several provisions of the Agreement that permit the parties to renegotiate or avoid the contract under specific circumstances. San Diego Gas contends that the parties would have inserted such an escape clause into the pricing arrangement if they had intended for the Agreement to be invalidated by a change in the Commission's procedures. Since Canadian Hunter seeks to avoid the contract on the basis of a statutory provision—Section 12(1) of the Alberta SGA—not a contractual provision, this argument is of no avail.

Third, San Diego Gas claims that, under ECAC review, the Commission never approved purchase transactions individually— that analysis of individual purchases simply informed the Commission's decision to approve or disapprove San Diego Gas' aggregate gas purchases. In support of this contention, San Diego Gas cites to an amicus brief filed with the district court in which the Commission itself stated, "[I]n ECAC reasonableness reviews, the Commission never specifically approved, either monthly or annually ... [San Diego Gas'] individual gas purchases on a contract-by-contract basis." Based on this statement and supporting evidence, San Diego Gas argues that the parties could not have intended for the Agreement's pricing arrangement to be based upon the Commission's review of individual transactions because that type of review never, in practice, took place.

While San Diego Gas' argument is superficially appealing, it is contradicted by both evidence and logic. First, despite its averment to the contrary, the Commission appears to have engaged in individual review of a purchase transaction in the Elk Hills decision, discussed above. Second, regardless of whether, in practice, the Commission generally approved and disapproved individual purchase transactions, it is undisputed that the Commission had the authority under ECAC review to disapprove individual transactions. The parol evidence offered by Canadian Hunter indicates that Paragraph 6.1 of the Agreement was designed specifically to meet that contingency, and San Diego Gas has been unable to identify any other plausible interpretation of its terms.

Finally, San Diego Gas contends that the district court usurped the jury's role by finding that, under PBR review, the Commission no longer individually approves purchase transactions. San Diego Gas claims that, when the Commission approves San Diego Gas' gas purchases in the aggregate, it implicitly approves the constituent individual transactions. Once again, however, San Diego Gas appears to miss the point. The PBR review mechanism renders the Commission approval clause in the pricing arrangement meaningless. Under PBR, the Commission no longer is capable of disallowing any of the individual transactions that comprise the Agreement WACOG. Thus, while the Commission may well be implicitly approving individual transactions, as San Diego Gas contends, it is undisputed that its actions no longer can affect the ultimate purchase price under the Agreement.

For these reasons, we find that no genuine disputes as to material fact compel denial of Canadian Hunter's motion for summary judgment.

## II. The district court properly granted CHML's motion for summary judgment.

Canadian Hunter argues that it is entitled to avoid its obligations under the Agreement because (1) Paragraph 6.1 requires a valuation by the Commission and (2) that valuation no longer takes place under PBR review, in violation of Section 12(1) of the Alberta Sale of Goods Act. Section 12(1) provides,

> When there is an agreement to sell goods on the terms that the price is to be fixed by the valuation of a third party and the third party cannot or does not make the valuation, the agreement is avoided.

SGA § 12(1). The parties do not dispute that the Agreement involves a sale of goods. Thus, our resolution of the merits of this case rests upon the same two-step inquiry undertaken by the district court. First, we must assess whether the final Agreement price is fixed by a "valuation" by the Commission. Second, we must determine whether that valuation still takes place under PBR review.

### A. Paragraph 6.1 of the Agreement requires a "valuation" by the CPUC.

█ In analyzing whether the Commission approval required by Paragraph 6.1 of the Agreement constituted a valuation under the SGA, the district court adopted a common sense definition of the term "valuation." The court noted that, under the ECAC review procedures in effect when the Agreement was signed, "the [Commission] had the power to modify the very measure of the Agreement['s] price terms, albeit after-the-fact, by evaluating and then approving or disapproving specific transaction costs which made up the Agreement WACOG." The court found this approval process to be "both functionally

and logically equivalent to a process of price 'valuation.'" The court also found that Paragraph 6.1 only made sense if it was read to require such a valuation by the Commission.

The district court's approach finds support in common law precedents.[1] In *Re: Nudgee Bakery Pty. Ltd's Agreement* (1971) Q.L.R. 24 (S.C.), for instance, the Supreme Court of Queensland, Australia reviewed a contract that stipulated that certain commodities would be sold at the maximum prices set each year under a legislative act. After the legislature ceased, by proclamation, to set prices for the commodities in question, the purchaser sought to avoid the contract. Interpreting a provision of the Australian Sale of Goods Act that is substantially similar to Section 12(1) of the Alberta SGA, the court determined that the legislature's setting of maximum prices had constituted a valuation. *Id.* at 28–29; *see also Firth v. Midland Railway Co.* 20 L.R. Eq. 100 (Ch. 1875) (decision by English court finding approval of plans and estimate for construction of road to constitute valuation).

San Diego Gas argues that *Nudgee Bakery* and *Firth* are irrelevant to the present dispute because, in each, a third party valuation fixed the contract price *in advance* of performance. San Diego Gas points out that, in contrast, the Commission's actions could affect the Agreement price only retroactively. For that reason, San Diego Gas maintains that Section 12(1) of the SGA is inapplicable. San Diego Gas does not, however, identify any clause of Section 12(1) requiring that the third party valuation take place before performance. Under the plain terms of Paragraph 6.1 of the Agreement, the final Agreement price can only be ascertained after CPUC approval or disapproval takes place. Thus, no less than in *Nudgee Bakery,* the Agreement price is fixed by the valuation of a third party. Accordingly, we find section 12(1) of the SGA to be applicable to the Agreement.

---

1. Canadian courts appear routinely to draw on common law precedents from other jurisdictions to fill in gaps in Canadian law. *See, e.g., Hillis Oil & Sales Ltd. v. Wynn's Canada, Ltd.* [1986] 1 R.C.S. 57, 67 (citing Iowa case to provide support for legal proposition); *Barnett v. Harrison* [1973] 57 D.L.R. (3d) 225, 246 (evaluating whether to adopt approach suggested by American and English authorities). While SAN DIEGO GAS objects to CHML's references to English and Australian case law, it provides no legal basis for its objections and cites to no authoritative Canadian cases interpreting SGA § 12(1).

**B. Under PBR review, the Agreement price no longer is fixed through a valuation by the CPUC.**

The district court found Paragraph 6.1 to require the Commission's approval or disapproval of individual purchase transactions. As discussed at length in Section I, above, that finding was supported by uncontradicted parol evidence and by common sense. Under PBR review, however, the Commission no longer is capable of disapproving any of the individual transactions that comprise the Agreement WACOG because it now reviews the reasonableness of San Diego Gas' expenditures in the aggregate.

Thus, we find that current PBR review procedures do not allow the Commission to make the valuation on which the final Agreement price is based and that the Commission's inability to do so violates Section 12(1) of the SGA.

**C. Alberta law does not permit San Diego Gas to waive the "as approved by the Commission" clause.**

██ San Diego Gas' final argument rests on a line of cases in which Canadian and American courts have permitted parties to waive contractual provisions included solely for their benefit. San Diego Gas argues that *Romaniuk v. Nelson* [1983] 4 D.L.R. 4th 51, is of particular relevance to this dispute. In *Romaniuk*, a purchaser of land obtained financing in a manner inconsistent with the land sale contract, and the seller sought to avoid the contract on that basis. Relying on an Ontario Court of Appeals decision, however, the *Romaniuk* court upheld the contract because the purchaser's actions had not adversely affected the seller. *Id.* at 54 (citing *Beauchamp v. Beauchamp* [1973] 32 D.L.R.3d 693).

San Diego Gas points out that the Commission approval clause could operate only to benefit San Diego Gas because the Commission would be likely to disapprove only prices it deemed to be too high, thereby reducing the amount owed by San Diego Gas to Canadian Hunter. Citing *Romaniuk* and *Beauchamp*, San Diego Gas contends that it consequently is entitled to waive its right to include only Commission-approved transactions in the Agreement WACOG.

The district court ignored this argument, and it does not warrant much more attention on appeal. In all of the cases cited by San Diego Gas in support of its waiver argument, including *Romaniuk* and *Beauchamp*, one party to a contract sought to avoid the contract based on the failure of a contractual provision, and the other party sought to uphold the contract, arguing that the provision in question was solely for its benefit and could be waived. In the present dispute, however, Canadian Hunter does not argue that it may avoid its obligations based solely on the failure of a contractual provision. Rather, Canadian Hunter contends that it can avoid its obligations on the basis of a statutory provision—Section 12(1) of the SGA. None of the cases cited by San Diego Gas involves a contract under the SGA or a comparable statute. If the Alberta legislature has concluded that a breakdown in the valuation process renders a contract voidable, it is beyond the province of the courts to impose a new rule.

Moreover, the SGA makes no provision for waiver in the event that a third party valuation would operate to benefit only one of the parties. The SGA states simply that a contract is avoided when a third party ceases to be able to fix the contract price. SGA § 12(1). As discussed above, that is precisely what occurred in this case. Accordingly, we find that San Diego Gas has no right to waive the "as approved by the [Commission]" provision.

**CONCLUSION**

For the foregoing reasons, the district court's grant of summary judgment to Canadian Hunter is AFFIRMED.